**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MCBRIDE BERRA AMBER TRAILS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. _____ |
| L.H.J. COMPANY and GOAD COMPANY, | ) ) ) | |
| Defendants. | ) ) ) | **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff McBride Berra Amber Trails, LLC ("MBAT"), by and through its undersigned attorneys, files this Complaint against Defendants L.H.J. Company and Goad Company (collectively "Defendants"), and alleges, upon information and belief, as follows:

**NATURE OF THE ACTION**

1.      This is a civil action against Defendants under Section 107 of the Comprehensive Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended ("CERCLA"); and the Court's power to exercise supplemental jurisdiction over several claims arising under Missouri statutory and common law, including a claim for breach of a sale contract.

2.      This Complaint seeks to hold Defendants legally responsible to pay the costs Plaintiff MBAT has incurred, or will in the future incur, as a result of buried waste materials deposited onto the property located at 266 Old State Road, Saint Louis, Missouri (the "MBAT Property") and the neighboring property at 260 Old State Road, St. Louis, Missouri (The "White Leaf Property") (the MBAT Property and White Leaf Property are together referred to herein as

1

the "Property").  Defendant L.H.J. Company previously owned the Property.  Defendant Goad

Company operated a manufacturing business at the White Leaf Property during L.H.J.

Company's ownership period and is the likely source of the contamination.

3.      Plaintiff MBAT purchased the MBAT Property and first discovered the waste and

debris while preparing the site for residential development. MBAT subsequently incurred costs

associated with the removal, testing, and disposal of the contaminated soil and buried waste

material, which included, *inter alia,* 148 buried 55-gallon drums, 50-60 tires, and soils

contaminated by hazardous substances.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction over the subject matter of this action pursuant

to §§ 107(a) of CERCLA (42 U.S.C. §§ 9607(a)), and pursuant to 28 U.S.C. §§ 1331 and 1345.

5.      Venue is proper in this district pursuant to § 113(b) of CERCLA (42 U.S.C. §

9613(b)), and 28 U.S.C. § 1391(b) because the release or threat of release of hazardous

substances giving rise to this claim and performance of the remedy occurred in this district.

6.      The Court has supplemental jurisdiction over the state law statutory, contract, and

common law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367(a).  These

supplemental claims are so related to the alleged CERCLA claim that they form part of the same

case or controversy under Article III of the United States Constitution.  Stated another way, these

supplemental claims and the original CERCLA claim "derive from a common nucleus of

operative fact" in that they all involve the same properties, contamination, and remedial action.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

## JURY TRIAL DEMAND

Plaintiff demands a jury trial as to all claims and issues triable of right by a jury.

## THE PARTIES

7.      Plaintiff **MBAT** is a Missouri limited liability company.  MBAT's principal place of business and corporate headquarters is located in St. Louis, Missouri.

8.      Defendant **L.H.J. Company** is a Missouri corporation formed January 29, 1968. L.H.J. Company's current principal place of business or corporate headquarters is located in Independence, Missouri. L.H.J. Company previously owned both the MBAT Property and the White Leaf Property.  Curtis Carl Goad is the president of L.H.J. Company and the sole member of L.H.J. Company's board of directors.

9.      Defendant **Goad Company** is a Missouri Corporation formed January 27, 1964. Goad Company's current principal place of business or corporate headquarters is located in Independence, Missouri.  Curtis Carl Goad is the president of Goad Company and the sole member of Goad Company's board of directors.

### THE SITES

**I.      The MBAT Property (266 Old State Road)**

10.      The MBAT Property, located at 266 Old State Road in Ellisville, Missouri, encompasses approximately 11.89 acres.

11.      From approximately August 1975 to June 2015, L.H.J. Company owned the MBAT Property.

12.      In June 2014, L.H.J. Company entered into a Sales Contract to sell the MBAT Property for $1.65 million to JHB Properties, Inc., which subsequently assigned, as Purchaser, all of its right, title, and interest in and to the Sales Contract to MBAT.  At the time of sale, L.H.J. Company was aware of the purchaser's intent to develop the property for use as a

3

residential subdivision.  A copy of the Sales Contract and the Assignment to MBAT are attached to this Complaint as Exhibits 1 and 2, respectively.

13.     The outlined area in Figure 1 depicts the MBAT Property at the time L.H.J. Company sold the property to MBAT and before MBAT commenced site activities to prepare the property for residential development:



*Figure 1.*

14.     Sometime between 1986 and 1990, during L.H.J. Company's ownership, the property was commercially developed for the first time when a recreation activity center was constructed on the MBAT Property, which included a driving range, a miniature golf course, and batting cages.  This recreational activity center was known as the Goad Company / Tower Tee West facility, which has not operated commercially since approximately 2005.

15.     In connection with the purchase of the MBAT Property from L.H.J. Company, MBAT retained Environmental Operations, Inc. ("EOI"), to perform a Phase I Environmental Assessment ("EA") of the MBAT Property to qualify for Landowner Liability Protection to CERCLA liability.  The EA found no significant environmental liabilities or off-site concerns affecting the MBAT Property, concluding that no evidence was found of recognized environmental conditions (as defined by ASTM Standard E 1527-13) in connection with the MBAT Property.

4

16.    Following purchase of the MBAT Property from L.H.J. Company in June 2015, MBAT began to prepare the MBAT Property for use as a residential subdivision.  During site improvement activities, MBAT discovered buried debris and other materials, including buried 55-gallon drums, fiberglass materials, resins, tires, and paint waste.

17.    Upon discovery of the buried materials, MBAT ceased development in the affected area and sought assistance from an environmental engineering firm.  The State of Missouri was subsequently contacted to report the discovery and, in October 2015, EOI commenced a removal action on the MBAT Property.

18.    After several months, EOI completed the removal action at the MBAT Property and issued a Remedial Action Completion Report, the State of Missouri will review.

**II.    The White Leaf Property (266 Old State Road)**

19.    The White Leaf Property consists of approximately 2.95 acres situated at 260 Old State Road in Ellisville, Missouri. The lot is rectangular and adjoins the MBAT Property on two sides.

5

20. The shaded area of Figure 2 below depicts the White Leaf Property, which adjoins the MBAT Property on its western and southern boundaries.



*Figure 2*

21. L.H.J. Company purchased the White Leaf Property and the MBAT Property as part of a single land purchase in August 1975. L.H.J. Company subsequently subdivided the land purchase into the two respective properties. The combined acreage of both properties is approximately 14.84 acres.

22. On the same day that L.H.J. Company purchased the combined properties on August 15, 1975, L.H.J. Company entered into a renewable five-year term lease with Goad Company (f/k/a Larry Goad & Company, Inc.) to lease to Goad Company part or all of the White Leaf Property beginning May 1, 1976. Goad Company continued to operate its manufacturing facility on the White Leaf Property until approximately the first half of 2003.

23. In entering into its lease with Goad Company in 1975, L.H.J. Company authorized Goad Company to use a single story office building and shop area located on the

6

White Leaf Property for the construction, manufacture, and fabrication of products and materials used in the company's business, which included the business of radiation and corrosion control.

24.     In June 1976, Goad Company secured financing, with the consent and agreement of L.H.J. Company, to make substantial leasehold improvements on the White Leaf Property, which included construction of an Armco "L" shaped steel building approximately 100 feet wide by 169 feet long with a cut out section to allow use of a 10 ton crane.

25.     When Goad Company ceased use of the White Leaf Property in 2003, an approximately 40,000 square-foot one-story interconnected manufacturing and warehouse building existed in the center of the White Leaf Property.

26.     An approximate 5,000 square-foot area of the building on the White Leaf Property no longer existed in 2003 because it had been destroyed by fire during a five-alarm blaze on June 24, 2002.   Prior to the fire, this 5,000 square-foot area was utilized as the steel blasting area.  Other parts of the building were used as a fiberglass shop area and warehouse by Goad Company before and after the fire in 2002.

27.     In May 2003, L.H.J. Company sold the White Leaf Property to White Leaf Enterprises, LLC ("White Leaf").  White Leaf currently leases the use of the premises to McIntyre Millwork & Hardwood Supply, Inc. (formerly known as McIntyre Woodworking, Inc.) (hereinafter "McIntyre Milling").

28.     Daniel McIntyre, President of McIntyre Milling and owner of White Leaf, retained EOI to perform an EA on the White Leaf Property in connection with the purchase of the property from L.H.J. Company, which was completed in February 2003.

7

29.     In February 2003, Goad Company stored materials in the warehouse portion of the building that included 55-gallon drums of resins, methyl ethyl ketone, acetone, and toluene, which Goad Company used in the fabrication of steel, fiberglass, and plastic process tanks.

30.     In February 2003, Goad Company was listed with the Missouri Department of Natural Resources ("MDNR") as a Small Quantity Generator of hazardous waste due to the type of materials utilized on-site during the tank-lining process.

31.     During EOI's excavation of buried waste material on the MBAT Property in 2015, EOI determined that the buried drums, discolored soil, and other visual indications of contamination were present on the excavated face at the property line separating the MBAT Property and the White Leaf Property.  EOI further performed sidewall testing at the property line that indicated Missouri Risk-Based Corrective Action ("MRBCA") default target level ("DTL") exceedances.

32.     After receiving consent from White Leaf owner Daniel McIntyre, EOI further characterized the waste on the White Leaf Property to evaluate potential remedial techniques to address concern of contamination and vapor migration from the existing waste at the White Leaf Property onto the MBAT Property.  After considering the long-term effectiveness, complexity, costs, and maintenance requirements of several potential remedial options to address this concern, EOI determined that complete excavation and removal of the soil containing paint and resin material of concern on the White Leaf Property was the most practical and cost-effective solution given the plan for residential development of the MBAT Property.

33.     At MBAT's direction, and with White Leaf's consent, EOI excavated and removed the paint/resin waste it located on the White Leaf Property to address the risk of migration of contaminants or vapors onto the MBAT Property in the future.

8

## SITE RESPONSE ACTIVITIES

34.     During excavation work associated with MBAT's residential development of the MBAT Property, MBAT discovered buried debris, including buried 55-gallon drums.  The Missouri Department of Natural Resources Emergency Response Division was notified of the discovery of these wastes and EOI was retained by MBAT to handle the removal, characterization, and disposal of the buried wastes.

35.     Prior to mobilizing at the MBAT Property, EOI prepared a Site Specific Health and Safety Plan, which it required onsite personnel to follow.  The plan contained, among other things, detailed measures for managing drums containing unknown contents to ensure a safe working environment for all EOI employees throughout the removal action.  All EOI employees followed this plan at all times during the removal action.

36.     Soon after MBAT retained EOI to undertake and manage the removal action, MBAT's attorneys sent a letter to Curtis Goad, President of both L.H.J. Company and Goad Company, on October 13, 2015, advising of the discovery of buried waste materials at the MBAT Property and inviting further involvement in addressing the buried materials discovered at the site.

37.     Following this letter, counsel for Defendants visited the MBAT Property and White Leaf Property on several occasions and observed removal actions, took photographs, and also took a single soil sample from one of the waste piles.

38.     EOI implemented a process for identifying the extent of the buried wastes identified on the Property.  EOI mobilized a tracked excavator and tracked front-end loader to the MBAT Property and removed the buried waste materials by excavating in all directions until these waste materials were no longer evident on the MBAT Property.  After all known debris

9

was removed from the MBAT Property, visible debris remained present in the excavated walls of the property line between the MBAT Property and the White Leaf Property, including 55-gallon drums.

39.     In order to remove all of the waste materials from the MBAT Property, it became necessary to remove material below the planned excavations needed to construct the residential development, with some areas requiring excavations 10 feet below ground surface.  This extra excavation required MBAT to refill the excavated areas with rock fill in order to prevent settling soil over these excavated areas, which further added to MBAT's project expenses.

40.     In addition, a newly installed sewer drainage pipe laid by MBAT as part of the residential development activities had to be removed to complete removal of wastes beneath and around the pipe.  The removal and replacement of this pipe further added to the costs MBAT incurred due to the presence of the buried waste materials.

41.     During removal actions, EOI monitored ambient air conditions and excavated soils were monitored for volatile organic compounds ("VOCs") using a photoionization detector ("PID").  Excavated waste materials were staged in stockpiles, and included soil mixed with construction and demolition wastes (including wood, foam insulation, metal, general trash), car and truck tires, and special waste (buried drums containing solidified paint waste and/or solid resins, other paint-related debris, and general trash).  Stockpiled materials were covered with 6-mil polyethylene sheeting to prevent erosion of the piles from rain or wind until the materials were tested and categorized for disposal or reuse.

42.     EOI collected soil samples from the staged stockpiles as well as in-situ soils, including excavation sidewalls and test trenches in areas of known and suspected buried wastes. Samples were analyzed for the following contaminants of concern: VOCs,  including total

10

petroleum hydrocarbons ("TPH") in the gasoline range organics ("GRO") using USEPA Method 8260; polynuclear aromatic hydrocarbons ("PAHs") and TPH in the diesel and oil range of organics using SW-846 Method 8270; and RCRA (8) Metals using EPA Methods 6010/7471.

43.     Where testing confirmed no levels above the MRBCA DTLs, the stockpile became available for potential reuse on the property.  General construction and debris wastes, which were not suitable for reuse per MDNR's Management of Construction & Demolition waste factsheet (October 2015), were segregated and marked for disposal.

44.     Where soil testing confirmed contamination levels above DTLs, further testing was done to ensure that the soil was not a hazardous waste under applicable law. While hazardous substances were found above DTLs for Benzo[a]pyrene, Lead, and Acetone, no hazardous wastes were identified by the characterization and testing.

45.     After completing characterization and testing, stockpiles were either marked for disposal as special waste, or potentially suitable for onsite reuse.

46.     Due to the concern of future contamination and vapor migration from the adjoining White Leaf Property to the MBAT Property, EOI performed a limited excavation on the White Leaf Property to remove wastes that could potentially impact the MBAT Property.

47.     A total of 5,344.30 tons of special waste was removed from the MBAT and White Leaf Properties and properly disposed of as special waste at IESI's Champ Landfill located in Maryland Heights, Missouri.  This included a total of 148 drums, many of which contained solidified paint and/or resin wastes, and approximately 50-60 tires.

48.     Once all waste debris was removed from the MBAT Property, confirmation sampling was performed to demonstrate that no contamination remains on the MBAT Property at levels inconsistent with residential use.

11

49.     EOI prepared a Remedial Action Completion Report recommending that no further action is required for residential use and occupancy of the MBAT Property.  The State of Missouri will review this Report and recommendation and is not expected to required additional work.

## STATUTORY BACKGROUND

**I.      Cost Recovery under CERCLA § 107.**

50.     Under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), "any person" who, at the time of "disposal" of any "hazardous substance," "owned or operated" any "facility" at which such hazardous substances were disposed of, shall be liable for any necessary costs of response incurred by any other person consistent with the national contingency plan ("NCP").

51.     Under Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), the term "person" means "an individual, firm, corporation, association, partnership, consortium, joint venture, [or] commercial entity. . ."

52.     Under Section 101(29) of CERCLA, 42 U.S.C. § 9601(29), and Section 1004(3) of the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), the term "disposal" means the discharge, deposit, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment…"

53.     The term "hazardous substances" is defined in §§ 101(14) of CERCLA (42 U.S.C. §§ 9601(a)) to include "any element, compound, mixture, solution, or substance designated pursuant to Section 9602 of this title [(42 U.S.C. § 9602)]."

54.     Pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602, Acetone has been defined as a CERCLA "hazardous substance." 40 C.F.R. § 302.4.

12

55.     Pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602, Benzo[a]pyrene has been defined as a CERCLA "hazardous substance." 40 C.F.R. § 302.4.

56.     Pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602, Lead has been defined as a CERCLA "hazardous substance." 40 C.F.R. § 302.4.

57.     Under Section 101(20)(A) of CERCLA, 42 U.S.C. § 9601(20(A)), the term "owner or operator" means "any person . . . owning or operating [a] facility."

58.     Under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), "facility" means, among other things, "any building, structure, installation, equipment, . . . well, pit, pond, lagoon, impoundment, ditch, landfill, storage container . . .or . . . any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located. . ."

59.     Under Section 101(23) of CERCLA, 42 U.S.C. § 9601(23), the terms "remove" or "removal" means "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release."

60.     Under Section 101(31) of CERCLA, 42 U.S.C. § 9601(31), the term "national contingency plan" means the national contingency plan published under section 311(c) of the Federal Water Pollution Control Act or revised pursuant to 42  U.S.C. § 9605.

II.     **Missouri Revised Statute Section 260.210.**

61.     Under RSMo. § 260.210.1, "It is unlawful for any person to: (1) Dump or deposit, or permit dumping or depositing of any solid wastes onto the surface of the ground . . . within the boundaries of the state except in a solid waste processing facility or solid waste disposal area having a permit . . ." or "(4) except as otherwise provided, store, collect, transport, process, or dispose of solid waste in violation of the rules, regulations or orders of the department or in such a manner as to create a public nuisance or adversely affect the public health."

62.     Under RSMo. § 260.210.2, "Information obtained from waste disposed or deposited in violation of this section may be a rebuttable presumption that the person so identified committed the violation of sections 260.200 to 260.345."

63.     Under RSMo. § 260.210.5, "Persons who knowingly haul solid waste or demolition waste to a site which is operating without a permit, persons who operate such a site and persons who own the property where the solid waste or demolition waste is being dumped or deposited shall be jointly and severally liable for cleanup costs and any damage to third parties caused by the dumping or disposing of solid waste or demolition waste on the property if the owner or operator has accepted remuneration or otherwise benefitted financially from such disposal."

64.     Under RSMo. § 260.210.5, "Any person may bring civil action for actual and exemplary damages against the responsible party if the person has sustained injury due to violations of this section."

65.     Under RSMo. § 260.200.1(31), the term "Person" is defined as "any individual, partnership, limited liability company, corporation, association, trust, institution . . . or any other legal entity."

66.     Under RSMo. § 260.200.1(45), the term "Solid waste" is defined as "garbage, refuse and other discarded materials including, but not limited to, solid and semisolid waste materials resulting from industrial, commercial, agricultural, governmental and domestic activities. . ."

67.     Under RSMo. § 260.200.1(47), the term "Solid waste disposal area" is defined as "any area used for the disposal of solid waste from more than one residential premises, or one or more commercial, industrial, manufacturing, recreational, or governmental operations."

**III.     Missouri Revised Statute Section 260.213.**

68.     Under RSMo. § 260.213, "No person may knowingly sell, convey or transfer title to any property that contains a permitted or unpermitted solid waste disposal site or demolition landfill, without disclosing to the buyer early in the negotiation process the existence and location of the site.  The seller shall also notify the buyer that he may be assuming liability to the state for any remedial action at the site, except that the sale, conveyance or transfer of property shall not absolve any person responsible for the illegal disposition of solid waste, including the seller, of liability for any remedial action at the site."

69.     Under RSMo. § 260.200.11, the term "Demolition landfill" means "a solid waste disposal area used for the controlled disposal of demolition wastes, construction materials, brush, wood wastes, soil, rock, concrete and inert solids insoluble in water."

## COUNT I

**(Cost Recovery under CERCLA §107)**

70.     Plaintiff MBAT realleges and incorporates paragraphs 1 through 69 as if fully set forth herein.

71.    Defendants are "person(s)" within the meaning of § 101(21) of CERCLA (42 U.S.C. § 9601(21)).

72.    The MBAT Property and White Leaf Property are "facilities" within the meaning of § 101(9) of CERCLA (42 U.S.C. § 9601(9)).

73.    From approximately 1975 to 2013, Defendant L.H.J. Company was an "owner or operator" of the MBAT Property and/or the White Leaf Property facilities within the meaning of Section 101(20)(A) of CERCLA (42. U.S.C. § 9601(20)(A)).

74.    From approximately 1975 to 2003, Defendant Goad Company was an "owner or operator" of the MBAT Property and/or the White Leaf Property facilities within the meaning of Section 101(20)(A) of CERCLA (42. U.S.C. § 9601(20)(A)).

75.    "Hazardous substances" were "disposed" of at the MBAT Property and White Leaf Property facilities, including but not limited to, Acetone, Benzo[a]pyrene, and lead, within the meaning of or as defined by CERCLA §§ 101(14), 101(29), and 102 (42 U.S.C. §§ 9601(14), 101(29), and 102).

76.    At all times relevant to this action, Defendants were each an "owner or operator" of the MBAT Property and/or the White Leaf Property "facilities" at the time of "disposal" of "hazardous substances" at these facilities, within the meaning of CERCLA §§ 101(9), 101(14), 101(20), 101(29), and 107(a) (42 U.S.C. §§ 9601(9), 9601(14), 9601(20), 9601(29), and 9607(a)).

77.    Plaintiff MBAT incurred necessary response costs at the MBAT Property and White Leaf Property consistent with the National Contingency Plan, promulgated under § 105(a) of CERCLA (42 U.S.C. § 9605(a)), and codified at 40 C.F.R. Part 300. ("NCP"), 40 C.F.R. Part 300.

16

78.     Defendants have failed to reimburse Plaintiff MBAT for any of its response costs in connection with cleanup of hazardous substances released at the MBAT Property and White Leaf Property.

79.     Defendants are jointly and severally liable to the Plaintiff MBAT for recovery of all costs expended on response actions, in connection with cleanup of hazardous substances released at the MBAT Property and White Leaf Property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MBAT respectfully requests that this Court:

(a)     Enter a judgment for cost recovery against Defendants pursuant to § 107(a) of CERCLA (42 U.S.C. § 9607(a)), for any and all response costs incurred by Plaintiff MBAT in performing response activities at the MBAT Property and White Leaf Property sites, including interest;

(b)     Enter a declaratory judgment that Defendants are jointly and severally liable for all response costs that will be incurred by Plaintiffs in the future, if any, related to performing response activities at the MBAT Property and White Leaf Property sites; and

(c)     Order such other and further relief as this Court may deem just and proper.

## COUNT II

**(State Law Breach of Contract against L.H.J. Company)**

80.     Plaintiff MBAT realleges and incorporates paragraphs 1 through 79 as if fully set forth herein.

81.     On or about June 13, 2014, L.H.J. Company entered into a Sales Contract with "JHB Properties, Inc., or Assigns" ("JHB") to sell the 11.81 acre MBAT Property for $1.65

million ("Sales Contract").  A copy of the Sales Contract is attached to this complaint as Exhibit 1.

82.     On or about October 30, 2014, JHB Properties, Inc. assigned all of its right, title, and interest in and to the Sale Contract with L.H.J. Company to Plaintiff MBAT.  Accordingly, MBAT became the purchaser to the Sales Contract, L.H.J. Company remained the seller.  A copy of the Assignment is attached to this Complaint as Exhibit 2.

83.     MBAT performed and fulfilled its obligations under the Sales Contract, including payment of the purchase price to L.H.J. Company.

84.     In the Sales Contract, L.H.J. Company made "representations and warrantees to PURCHASER" that expressly survived closing.

85.     L.H.J. Company represented and warranted that "SELLER . . . has no knowledge of, the existence of any environmental hazard in or around the subject property."

86.     L.H.J. Company further represented and warranted, "To the best of SELLER's knowledge, the subject property is suitable for PURCHASER's proposed use and all other lawful activities."

87.     L.H.J. Company also represented and warranted that "Seller has received no notice that the subject property is not in compliance with all federal, state and local environmental standards or guidelines."

88.     Finally, L.H.J. Company "agree[d] to indemnify, defend and hold harmless PURCHASER from and against any loss, damage, liability and expense, including reasonable attorneys (*sic*) fees and other litigation expenses, which PURCHASER may suffer, sustain, or incur as a result of any misrepresentation or breach of warranty with respect to the foregoing representations and warranties."

18

89.     L.H.J. Company exclusively owned the MBAT Property from 1975 through June 2014.

90.     L.H.J. Company exclusively owned the White Leaf Property from approximately 1975 to 2003.

91.     Goad Company leased from L.H.J. Company facilities located on the White Leaf Property from approximately 1976 through 2003.

92.     From approximately 1978 through at least 2015, Curtis Goad had the capacity of an officer, employee, agent, or director of L.H.J. Company at the same time he had the capacity of an officer, employee, agent, or director of Goad Company.  Accordingly, L.H.J. Company had knowledge of Goad Company operations by virtue of Curtis Goad's capacity within both companies.

93.     Upon information and belief, due to the depth, area, nature, and extent of materials deposited on the Property, representatives, employees, and/or officers of L.H.J. Company knew about the deposition of such materials on its property that were deposited during its ownership of the Property.

94.     Upon information and belief, due to the nature of and information obtained from the excavated waste material at the Property, including tire markings (and DOT manufacture codes), a car battery, several 55-gallon drum labels, and other waste materials, these solid waste materials were disposed of during the time Defendants owned and operated the Property.

95.     Upon information and belief, L.H.J. Company had knowledge of the disposal of wastes on its property during L.H.J. Company's ownership of the Property.

96.     L.H.J. Company did not disclose the existence of the buried wastes in and around the MBAT Property to MBAT in connection with the sale of the property to MBAT.

19

97.     L.H.J. Company's representation and warranty that the L.H.J. Company "has no knowledge of, the existence of any environmental hazard in or around the subject property" was inaccurate, false, and misleading.

98.     L.H.J. Company was aware of the intent to develop the MBAT Property into a residential subdivision at the time it sold the MBAT Property to MBAT.

99.     L.H.J. Company's representation and warranty that "the subject property is suitable for PURCHASER's proposed use and all other lawful activities" was also inaccurate, false, and misleading.

100.     L.H.J. Company had actual or constructive notice of the environmental laws, standards, or guidelines of the United States, the State of Missouri, and any applicable local ordinances during its ownership of the MBAT Property.

101.     L.H.J. Company was, therefore, on notice the disposal of the aforementioned wastes on the MBAT Property during L.H.J. Company's ownership period was not in compliance with all federal, state, and local environmental standards or guidelines.

102.     L.H.J. Company's representation and warranty in its Sales Contract that "Seller has received no notice that the subject property is not in compliance with all federal, state and local environmental standards or guidelines" was an inaccurate, false, and misleading representation.

103.     L.H.J. Company materially breached the warranties made in its Sales Contract by making inaccurate, false, and misleading representations that MBAT relied upon, resulting in harm to Plaintiff MBAT.

104.     Accordingly, Defendant L.H.J. Company is legally responsible to indemnify MBAT "from and against any loss, damage, liability and expense, including reasonable attorneys

20

(sic) fees and other litigation expenses" that MBAT "may suffer, sustain, or incur as a result of any misrepresentation or breach of warranty" made by L.H.J. Company in its Sales Contract."

105.    As a result of L.H.J. Company's misrepresentations and breach of warranties, MBAT has incurred damages, expenses, and reasonable attorneys' fees and other litigation expenses in excess of, but not limited to, $647,888.30 to date.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MBAT respectfully requests that this Court:

(a)    Enter a judgment against L.H.J. Company for all of its damages, expenses, and reasonable attorneys' fees and other litigation expenses, incurred as a result of Defendant L.H.J. Company's breach of the representations and warranties made in its Sales Contract;

(b)    Enter a declaratory judgment that L.H.J. Company will remain liable for all future expenses that will be incurred by Plaintiff in the future as a result of Defendant's breach of warranty; and

(c)    Order such other and further relief as this Court may deem just and proper.

## COUNT III

## (Private Cause of Action under RSMo. § 260.210)

106.    Plaintiff MBAT realleges and incorporates paragraphs 1 through 105 as if fully set forth herein.

107.    Defendants violated RSMo. § 260.210.1 in that Defendants dumped or deposited, or permitted dumping or depositing of solid wastes onto the surface of the ground at the MBAT Property and/or White Leaf Property, within the boundaries of the State of Missouri, without obtaining a permit legally allowing such action.

108.     Defendants violated RSMo. § 260.210.1 in that Defendants stored, collected, transported, processed, or disposed of solid waste on the MBAT Property and/or the White Leaf Property in violation of the rules, regulations or orders of the department or in such a manner as to create a public nuisance or adversely affect the public health.

109.     Under RSMo § 260.210.2, Plaintiff is entitled to a rebuttable presumption that Defendants illegally disposed of the solid wastes on the MBAT Property and/or White Leaf Property in violation of RSMo. § 260.210 if information obtained from the excavation of waste disposed of on the Property identifies Defendants as a source of the material.

110.     Excavated waste material from the solid waste disposal area on the Property containing drums, tires, and other special wastes have been and continue to be evaluated for information.  Plaintiff performed a preliminary investigation of these buried wastes, which included evaluation of tire markings (including DOT manufacture codes), a car battery, several 55-gallon drum labels, and other waste materials, and has obtained evidence establishing that solid waste materials were disposed of during the time Defendants owned and operated the Property.

111.     From approximately 1978 through at least 2015, Curtis Goad had the capacity of an officer, employee, agent, or director of L.H.J. Company at the same time he had the capacity of an officer, employee, agent, or director of Goad Company.  Accordingly, L.H.J. Company had knowledge of Goad Company operations by virtue of Curtis Goad's capacity within both companies.

112.     Upon information and belief, due to the depth, area, nature, and extent of materials deposited on the Property, representatives, employees, and/or officers of L.H.J.

22

Company knew about the deposition of such materials on its property deposited during its ownership of the property.

113.    Upon information and belief, due to the depth, area, nature, and extent of materials deposited on the Property, representatives, employees, and/or officers of Goad Company would have known about the deposition of such materials on the Property deposited during the term of Goad Company's lease with L.H.J. Company.

114.    Goad Company stored, used, or otherwise caused to be delivered 55-gallon drums of Acetone to the White Leaf Property during its business operations there.  L.H.J. Company expressly or impliedly consented or permitted Goad Company to store or use 55-gallon drums of Acetone on its White Leaf Property during the pendency of its lease with Goad Company.

115.    Goad Company utilized Acetone as part of its manufacturing operations at the White Leaf Property. L.H.J. Company was aware that Goad Company stored or used 55-gallon drums of Acetone on its White Leaf Property during the pendency of its lease with Goad Company, and expressly or impliedly consented to or permitted this action.

116.    Goad Company caused 55-gallon drums of resins and/or other hazardous substances (defined by Section 101(14) of CERCLA (42. U.S.C. § 9601(14)), to be delivered to the White Leaf Property during its business operations at that location.  L.H.J. Company was aware that Goad Company had 55-gallon drums of resins and/or other hazardous substances present at its White Leaf facility during the pendency of its lease with Goad Company and expressly or impliedly consented to or permitted this to occur.

117.    Upon information and belief, Goad Company created, used, or handled benzo[a]pyrene during its operations at the White Leaf Property, whether as a chemical utilized in the manufacturing of products or as a waste byproduct of its operations.  Upon information

23

and belief, L.H.J. Company did not restrict the use or presence of benzo[a]pyrene by Goad Company at its White Leaf Property and expressly or impliedly consented to or permitted its use or presence during Goad Company's lease with L.H.J. Company.

118.    Goad Company manufactured fiberglass at the White Leaf Property for use in tank construction and/or tank linings.  L.H.J. Company was aware that Goad Company manufactured fiberglass at the White Leaf Property during its lease to Goad Company and expressly or impliedly consented or permitted its manufacture and use at the property.

119.    Fiberglass and other tank lining materials were located throughout the debris field buried under the MBAT Property and White Leaf Property.

120.    Upon information and belief, fiberglass and other tank lining materials recovered from the buried debris originated from Goad Company operations.

121.    Goad Company and L.H.J. Company benefited financially from the disposal of waste materials on the Property both in terms of achieving a cost savings over permitted disposal options and in terms of continuing a business relationship that resulted in long-term leasing of the subject property at considerable value to both Defendants.

122.    Plaintiff MBAT has sustained injury due to violation of RSMo. § 260.210, including costs of removal, delayed project costs, interest, and other costs and expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MBAT respectfully requests that this Court:

(a)     Enter a judgment finding Defendants jointly and severally liable for cleanup costs and actual damages MBAT has incurred as a result of the dumping or disposing of solid waste or demolition waste on the subject properties;

(b)     Enter a judgment awarding exemplary damages permitted by RSMo. § 260.210.5.

24

(c)     Enter a declaratory judgment that each of the Defendants are jointly and severally liable for all response costs that will be incurred by Plaintiffs in the future, if any, related to performing response activities at the MBAT Property and White Leaf Property sites; and

(d)     Order such other and further relief as this Court may deem just and proper.

## COUNT IV

### (Negligence Per Se against L.H.J. Company)

123.     Plaintiff MBAT realleges and incorporates paragraphs 1 through 122 as if fully set forth herein.

124.     RSMo. § 260.213 provides, "No person shall convey or transfer title to any property that contains a permitted or unpermitted solid waste disposal site or demolition landfill, without disclosing to the buyer early in the negotiation process the existence and location of the site."

125.     Defendant L.H.J. Company is a "person'' within the meaning of § 260.213.

126.     Defendant L.H.J. Company conveyed or transferred title to the MBAT Property to L.H.J. Company at the time it contained a permitted or unpermitted solid waste disposal site or demolition landfill, without disclosing to the buyer early in the negotiation process the existence and location of the site.

127.     L.H.J. Company further did not notify JHB / MBAT that it may be assuming liability to the state for any remedial action at the site, as required by RSMo. § 260.213.

128.     RSMo. § 260.213 created a legal duty for L.H.J. Company to disclose the existence of any solid waste disposal site or demolition landfill on its MBAT Property to which it had knowledge of prior to the sale of that property to JHB / MBAT.

129.    From approximately 1978 through at least 2015, Curtis Goad had the capacity of an officer, employee, agent, or director of L.H.J. Company at the same time he had the capacity of an officer, employee, agent, or director of Goad Company.  Accordingly, L.H.J. Company had knowledge of Goad Company operations by virtue of Curtis Goad's capacity within both companies.

130.    Upon information and belief, due to the depth, area, nature and extent of materials deposited on the MBAT Property, current or past representatives, employees, and/or officers of L.H.J. Company knew about the deposition of such materials on its property deposited during its ownership of the Property.

131.    Upon information and belief, L.H.J. Company knew it was selling, conveying, and/or transferring property that contained buried solid waste materials or demolition materials when it sold the MBAT Property to MBAT.

132.    L.H.J. Company violated RSMo. § 260.213 by failing to disclose to JHB / MBAT the existence of the solid waste disposal site or demolition landfill on the MBAT Property.

133.    Had L.H.J. Company not violated RSMo. § 260.213, the purchase price of the MBAT Property would have been reduced to account for the anticipated cost associated with a removal action to remove the buried waste materials and ensure the MBAT Property was suitable for its intended residential use.

134.    Plaintiff MBAT was, therefore, damaged as a result of L.H.J. Company's violation of RSMo. § 260.213.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MBAT respectfully requests that this Court:

(a)  Enter a judgment against Defendants and award damages to MBAT that resulted from L.H.J. Company's violation of RSMo. § 260.213, including interest; and

(b)  Order such other and further relief as this Court may deem just and proper.

## COUNT V

### (Trespass against Goad Company)

135.  Plaintiff MBAT realleges and incorporates paragraphs 1 through 134 as if fully set forth herein.

136.  Defendant Goad Company is liable for common-law trespass in that it created and/or maintained upon the MBAT Property a landfill area containing solid wastes, hazardous substances, and construction debris wastes, which Goad Company caused to be buried beneath the ground without authorization or consent by the owner of the MBAT Property.

137.  Goad Company did not remove said waste and debris it deposited onto the MBAT Property.

138.  Deposition of said wastes and debris interfered with the right of MBAT, as owner of the MBAT Property, to develop its property for residential use.

139.  MBAT was injured by Goad Company's trespass in that it incurred significant costs and expense in removing and disposing of the waste and debris deposited by Goad Company on the MBAT Property.

140.  Accordingly, Goad Company is liable to MBAT for damages MBAT sustained due to Goad Company's trespass onto the MBAT Property.

27

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MBAT respectfully requests that this Court:

(a)     Enter a judgment in favor of Plaintiff MBAT and against Defendant Goad
        Company for trespass, awarding any and all response costs incurred by Plaintiff
        MBAT in removing the wastes and debris deposited by Goad Company onto the
        MBAT Property;

(b)     Enter a declaratory judgment that Defendant Goad Company remains liable for
        any and all future costs incurred by Plaintiff as a result of Defendant Goad
        Company's deposition of material on the MBAT Property; and

(c)     Order such other and further relief as this Court may deem just and proper.

## COUNT VI

### (Nuisance against Goad Company)

141.    Plaintiff MBAT realleges and incorporates paragraphs 1 through 140 as if fully
set forth herein.

142.    Defendant Goad Company had a possessory interest in the White Leaf Property
adjacent to the MBAT Property at the time it placed, buried, and maintained upon both
properties waste materials and debris, including hazardous substances and paint-related wastes.

143.    Defendant Goad Company's unreasonable placement and maintenance of said
wastes adversely affected the commercial value of Plaintiff's land.  Specifically, the existence of
said waste substantially impaired Plaintiff's ability to develop its land into a residential
subdivision until said wastes were removed at significant expense to MBAT.

144.     Prior to the removal action, the nuisance caused by the existence of the buried waste materials on the MBAT Property decreased the value of the MBAT Property equal to or greater than the cost MBAT incurred in performing the removal action on the Property.

145.     MBAT obtained consent of White Leaf to remove buried wastes and debris on the White Leaf Property that posed a risk of migration to the MBAT Property.

146.     EOI determined that a limited removal action on the White Leaf Property was the most effective and reasonable action to abate the nuisance to the MBAT Property caused by these wastes.

147.     In order to protect the value of its property and its intended use of its property, MBAT incurred substantial expense to remove the nuisance caused by Goad Company on both the MBAT and White Leaf Properties.

148.     Accordingly, the nuisance Goad Company caused on the White Leaf and MBAT Properties injured MBAT by causing damages equal to or exceeding the costs MBAT incurred to remove the nuisance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MBAT respectfully requests that this Court:

(a)     Enter a judgment in favor of Plaintiff MBAT and against Defendant Goad Company for nuisance, awarding damages equal to or exceeding the amount Plaintiff MBAT incurred in removing the wastes and debris deposited by Goad Company onto the MBAT Property and adjoining White Leaf Property;

(b)     Enter a declaratory judgment that Defendant Goad Company remains liable for any and all future costs incurred by Plaintiff, if any, as a result of Defendant Goad

29

Company's creation of nuisance on the MBAT Property and adjoining White Leaf

Property; and

(c)     Order such other and further relief as this Court may deem just and proper.

Respectfully submitted,

By:  /s/  *Jonathan R. Waldron*

Jason Flower, #54000MO
Jonathan R. Waldron, #58898MO
Husch Blackwell LLP
190 Carondelet Plaza, Ste. 600
St. Louis, Missouri 63105
Jason.flower@huschblackwell.com
Jonathan.waldron@huschblackwell.com
Telephone:  (314)480-1500
Fax: (314)480-1505

**Attorneys for McBride-Berra**
**Amber Trails, LLC**